## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RHONDA BROCKINGTON,<br><br>                 Plaintiffs,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., as Secretary of the Department of Health & Human Services; the UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, a federal department; THOMAS J. ENGELS, as Administrator of the Health Resources & Services Administration; and the HEALTH RESOURCES & SERVICES ADMINISTRATION,<br><br>                 Defendants. | Civil Action No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by her attorneys at Brooklyn Legal Services, for her complaint against Defendants for violating the Administrative Procedures Act, 5 U.S.C. § 551 *et seq*., and the Fifth, Seventh, and Eighth Amendments to the United States Constitution, alleges as follows:

### PRELIMINARY STATEMENT

1.     Plaintiff Rhonda Brockington ("Ms. Brockington") was a Lieutenant Commander in the Naval Reserves, a Major in the U.S. Army and a nurse practitioner when the facts underlying this action arose.

2.     In 2009, Ms. Brockington was working as a nurse practitioner at a health clinic for homeless families in the Bronx.

3.     Three months into her employment, she decided to take advantage of the National

1

Health Service Corp (NHSC) Loan Repayment program offered by defendants, whereby her $24,321 in federal student loans would be forgiven if she agreed to remain for 24 months at the Bronx clinic, which met the requirements of the NHSC loan repayment program.

4.      Thirteen (13) months into her 24-month obligation, Ms. Brockington was called-up by the Navy to serve as a nurse practitioner in war zones and secured areas within and outside Iraq and Afghanistan.

5.      During her one year of active military service, she cared for gravely wounded soldiers in the field of battle as well as in war-zone military bases and on military aircraft.

6.      After her Naval service ended, Ms. Brockington took an authorized leave of absence from her NHSC-approved position in the Bronx.

7.      During her leave of absence, her NHSC position at the health clinic was eliminated.

8.      In need of income to support herself, Ms. Brockington enlisted in the Army as a Major and, as instructed by defendants, sought a substitute NHSC position at another health clinic.

9.      No NHSC positions were available in or near New York City; the closest available position was hundreds of miles away, near the Canadian border.

10.     Defendants arbitrarily and capriciously refused to pause Ms. Brockington's obligations despite this obstacle and instead declared her to be in breach of her agreement.

11.     Defendants assessed a $10,480 overpayment against Ms. Brockington and then imposed a fine of over $82,000 plus interest.

12.     Defendants garnished Major Brockington's pay, intercepted her tax refunds, and

2

extracted payments from her for over eight years, which amounted to, on information and belief, $109,410.70.

13.    Defendants refused to return these funds--even after waiving the remaining balance of the debt after determining Ms. Brockington's service-connected disability made completing her remaining term of service "impossible."

14.    Defendants stated they "lacked statutory authority" to treat her almost nine years of U.S. Army service as having satisfied her remaining 11-month service obligation to the NHSC.

15.    Defendants did not analyze whether imposing and collecting the debt caused "extreme hardship" and was "against equity and good conscience," as required under the program's regulations.

16.    Defendants' decision not to return the $109,410.70 collected and taken from Major Brockington violated the Administrative Procedures Act, as applied to her, because it was arbitrary and capricious. 5 U.S.C. § 706(2)(A).

17.    Defendants' decision to keep the wrongfully collected monies from Ms. Brockington also violated the Fifth, Seventh and Eighth Amendments to the United States Constitution because Major Brockington was not advised of her right to obtain a waiver, the debt was assessed against her without a jury trial, and the punitive damages portion of her debt was excessive. 5 U.S.C. § 706(2)(B).

18.    Ms. Brockington seeks the disgorgement of wrongfully collected monies but does not seek other damages.

19.

3

## JURISDICTION

20.     Plaintiff brings this action under the Administrative Procedures Act, 5 U.S.C. §§ 702 and 704, and the Fifth, Seventh and Eighth Amendments to the United States Constitution.

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4) over claims arising under the Constitution and laws of the United States.

22.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. § 2201.

23.     This Court has authority to enjoin Defendants to disgorge illegally collected monies pursuant to 5 U.S.C. §§ 702-706, as discussed in *Bowen v. Massachusetts*, 487 U.S. 879, 909–12 (1988).

24.     This Court has personal jurisdiction over Defendants as agents of the United States.

## VENUE

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because Ms. Brockington resides in New York County, no real property is involved in this action, and Defendants are officers, employees, and agencies of the United States.

## PARTIES

26.     Plaintiff Rhonda Brockington is a 56-year-old retired Army Major who lives in New York County, New York with her eight-year-old son.

27.     Defendant Robert F. Kennedy, Jr., is the Secretary of the United States

Department of Health & Human Services ("Defendant Secretary" or "Secretary").  He is sued only in his official capacity.

28.    Defendant Thomas J. Engels is the Administrator of the United States Health Resources & Services Administration ("Administrator").  He is sued only in his official capacity.

29.    The United States Department of Health & Human Services ("Defendant HHS") houses the United States Health Resources & Services Administration ("Defendant HRSA").

30.    Defendant HRSA and Defendant HHS oversee the National Health Service Corps ("NHSC") loan repayment program. They are responsible for determining when a participant is in breach of a NHSC contract and when a service obligation and/or debt may be waived.

31.    Both Defendant HHS and Defendant HRSA are "agencies" within the meaning of the Administrative Procedures Act ("APA"), 5 U.S.C. § 551(1).

## FACTUAL ALLEGATIONS

### National Health Service Corps

32.    In 1970, Congress created the National Health Service Corps.

33.    Its purpose is "to assure an adequate supply of trained health professionals . . . in designated health provider shortage areas throughout rural and low-income urban areas." 42 C.F.R. §§ 62.1 and 62.21.

34.    Initially, the NHSC only provided educational scholarships to medical students who agreed to serve in the designated health provider shortage areas for set periods of time following graduation, *e.g.*, four years of medical service for four years of scholarship support. 42 U.S.C. 254l(f)(1)(B)(v)(I).

35.     This initial approach was structurally inadequate and did not achieve the program's objectives. Scholarship participants took as long as seven years to complete their training.  Accordingly, the interests, career goals, and family responsibilities of scholarship participants could change over this extended period, resulting in scholarship participants not completing their service obligations. General Accounting Office, *National Health Service Corps, Opportunities to Stretch Scarce Dollars and Improve Provider Placement*, at 29, (GAO/HEHS-96-28) (Nov. 1995), (*GAO Report 1995*), available at http://www.gao.gov/assets/230/221979.pdf

36.     Indeed, about 12% of scholarship participants changed their minds about working in rural or low-income urban areas and do not fulfill their terms of service.  *Id*. at 12.

37.     When a scholarship recipient defaulted, the government lost a large financial investment in that individual.

38.     Indeed, the General Accounting Office noted that the scholarship program was not cost effective when one considered the high default rate and high cost of educating a medical professional. *Id*. at 2-3.

39.     In 1987, Congress added the student loan repayment program ("Loan Repayment Program") as a new tool to incentivize nurses like Ms. Brockington to work at NHSC-approved sites. 42 U.S.C. § 254l-1.

40.     Under the Loan Repayment Program, NHSC pays a participant's student loans, up to a statutory amount ($50,000 in 2009 when Ms. Brockington enrolled), in exchange for 24 months of service. 42 U.S.C. § 254l-1(g).

41.     The GAO noted the Loan Repayment Program was much more cost effective than

the scholarship program for two reasons. *GAO Report 1995*, at 2-3.

42.    First, the government paid smaller grants to loan repayment participants than those requiring scholarships.

43.    Second, the default rate of loan repayment participants was much lower (2 percent) than scholarship participants (12 percent) because its participants already were committed to working in underserved areas when they applied for loan repayment. *GAO Report 1995*, at 8.

44.    Unlike scholarship participants, medical professionals could not apply to the loan repayment program until after getting a job at an NHSC-approved site. The Lewin Group, *Provider Retention in High Need Areas, Final Report* at 29 (December 22, 2014)("*Lewin Group Report 2014*"), available at

https://aspe.hhs.gov/sites/default/files/private/pdf/116861/NHSC%2520Final%2520Report%2520508%2520compliance%2520July_21_2015.pdf .

45.    Almost half of Loan Repayment Program participants learned about the program from their NHSC-approved employers *after* accepting employment.  Donald E. Pathman, M.D., M.P.H. *Evaluating Retention in BCRS Programs, Final Report* at 85 (March 30, 2012) ("*Pathman Retention Report 2012*"), available at https://www.shepscenter.unc.edu/wp-content/uploads/2017/08/Evaluating-Retention-in-BCRS-Programs-Final-Report_Pathman_5-4-12-1.pdf .

46.    This reflects the strong public service commitment that already motivated participants like Ms. Brockington who were willing to pursue public service work even without

the loan repayment benefit.

47.    Indeed, almost two-thirds of NHSC participants would have taken their NHSC job even if the NHSC loan repayment benefit did not exist. *Pathman Retention Report 2012* at 85.

48.    On average, a participant's application for the Loan Repayment Program was filed more than nine months *after* the beginning of their employment at an NHSC-approved site. *Id*. at 84.

49.    This gap between the start of employment and the application for the Loan Repayment Program contributed to the low (2 percent) default rate for the 24-month service obligation because loan repayment applicants, unlike scholarship recipients, knew whether they could commit to working at the NHSC-approved site. *GAO Report 1995 Report* at 8.

**Rules and Legislative History regarding Breaching a NHSC Contract**

50.    Breaching an NHSC contract has draconian financial consequences.

51.    A *scholarship* recipient who does not complete their term of service is liable for liquidated damages equal to three times the amount of the scholarship award, discounted for any amount of time served by the recipient, plus interest at the maximum legal prevailing rate. 42 U.S.C. § 254o(b)(1).

52.    Pursuant to 42 U.S.C. § 254o(c), a *loan repayment recipient*, such as Ms. Brockington, who breaches their term of service, is liable for liquidated damages equal to:

A) the total amount of the loan repayment grant received for the period of obligated service not served; and

B) an amount equal to the product of the number of months of obligated service not served multiplied by $7,500; and

8

C) interest on the amounts described in subparagraphs (A) and (B), at the maximum legal prevailing rate, as determined by the Treasurer of the United States, from the date of the breach;

53.     Further, the statutory liquidated damages amount calculated under the above recited formula cannot be less than $31,000. 42 U.S.C. § 254o(c).

54.     The $7,500 per month penalty for a loan repayment breach is excessive because it is neither related to the damage sustained by the government nor a necessary deterrent.

55.     From 1987 to 2002, Congress imposed a $1,000 penalty for each month of non-service for a *loan repayment* breach. 42 U.S.C. § 254o(c)(2) (effective through October 25, 2002).

56.     In 2002, Congress increased the monthly penalty rate from $1,000 to $7,500.  42 U.S.C. § 254o(c)(1)(B) (effective October 26, 2002).

57.     Congress increased the monthly penalty without citing any evidence that the $1,000 per month penalty was not an adequate deterrent against default (which was very low (2%) when last measured in 1995). *See* Senate Report (Health, Education, Labor, and Pensions Committee), 2001 WL 1243928, 2002 U.S.C.C.A.N. 1033, 1057-1058 (Leg.Hist.) (October 11, 2001) (*Senate Report 2001*) and *GAO Report 1995* at 8.

58.     Rather, Congress noted that the average penalty associated with a *scholarship* default—a much more expensive program with much higher default rates, as described above— was higher ($252,296) than the average penalty associated with a *loan repayment* default ($57,948). *Senate Report 2001* at **1058.

59.     It arbitrarily concluded that liquidated damages associated with both programs

should be equalized, so as to equally penalize those who did not complete their service, and

hence the $1,000 per month penalty was raised to $7,500 for the Loan Repayment Program only.

*Id*.

60.    The difference in the average penalty levied between the scholarship and loan

repayment programs, however, had no relationship to the financial loss to the government from

defaults.

61.    In 2002, when the penalty was increased, 81% of NHSC's doctors, nurses and

other healthcare professionals were enrolled in the Loan Repayment Program, as opposed to only

19% in the scholarship program, making costly *scholarship* defaults rare. *Lewin Group 2014*

*Report* at 10.

62.    Because each *scholarship* default, while costly, was infrequent, it did not

represent a typical "liquidated damage" suffered by the government, warranting an increase in

the penalty provision.

63.    Rather, the purpose of the $7,500 a month liquidated damages clause in 42 U.S.C.

§ 254o(c)(1)(B) was to punish a loan repayment borrower who defaulted, not to compensate the

government for its losses.

**Waiver Rules**

64.    Because the penalties for breach of an NHSC contract are severe, Congress and

Defendant Secretary provided a waiver provision for participants who could not complete their

service obligations.

65.    Congress delegated rulemaking authority to the Secretary to "provide for the

10

partial or total waiver or suspension of any obligation of service or payment by an individual . . . whenever compliance by the individual is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable." 42 U.S.C. § 454o(d)(2).

66.    The Code of Federal Regulations ("Federal Regulations") provide that:

The Secretary may waive or suspend any service or payment obligation incurred by a participant whenever compliance by the participant (i) is impossible, or (ii) would involve extreme hardship to the participant and if enforcement of the service or payment obligation would be against equity and good conscience.

42 C.F.R. §§ 62.12(b)(2)(ii) and 62.28.

67.    The Federal Regulations define "impossibility" as: "the participant suffers from a physical or mental disability resulting in the permanent inability of the participant to perform the service or other activities which would be necessary to comply with the obligation." 42 C.F.R. § 62.12(c).

68.    With respect to "extreme hardship and against equity and good conscience," the Federal Regulations provide that the Secretary "will consider":

(1) The participant's present financial resources and obligations; (2) The participant's estimated future financial resources and obligations; and (3) The extent to which the participant has problems of a personal nature, such as physical or mental disability, terminal illness in the immediate family which so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred.

42 C.F.R. §§ 62.12(d).

11

**Ms. Brockinton's Public Service Work Leads Her to NHSC**

69.     Ms. Brockington completed her undergraduate Bachelor of Science degree and became a registered nurse in 1996.

70.     Ms. Brockington graduated with no debt, instead paying for her education with grants, including a federal need-based grant given to low-income students through the Pell Program.

71.     In 1999, Ms. Brockington enlisted in the U.S. Navy Reserves, where she eventually rose to the rank of Lieutenant Commander.

72.      In 2002, Ms. Brockington resumed her education to become a nurse practitioner.

73.     To pay for her tuition toward her nurse practitioner degree, Ms. Brockington borrowed $34,650 in federal loans that she repaid at the rate of $147.09 a month.

74.     Ms. Brockington dedicated her entire career to public service, caring for: CUNY and middle school students; hospice patients in nursing homes; homeless families; sickle cell disease patients at Montefiore Hospital; and soldiers in rural America, West Point, Walter Reed Hospital, Guantanamo Cuba, and war-torn regions overseas.

75.     Ms. Brockington began working at Montefiore Hospital in 2007, caring for sickle cell disease patients.

76.     During the Great Recession, Montefiore reduced its staff, including Ms. Brockington, who was laid off from the sickle cell clinic in early 2009.

77.     Ms. Brockington was thereafter offered a position at a Montefiore clinic that served homeless families.

12

78.     Ms. Brockington was reluctant to take the position at the Montefiore clinic because it paid poorly.

79.     In trying to persuade Ms. Brockington to take the position,  the Montefiore clinic told her that it was an NHSC-approved work site, and while the pay was less than what she was accustomed to, she could enroll in the NHSC's Loan Repayment Program and, if accepted, have her student loans forgiven.

80.     In June 2009, Ms. Brockington took the position at the Montefiore clinic, not for the NHSC benefit (because her loan payments were affordable at only $147.09 a month), but rather because she needed income and wanted meaningful work.

81.     After accepting the Montefiore clinic position, a clinic employee briefed Ms. Brockington on the benefits of the NHSC Loan Repayment Program.  Ms. Brockington understood that she was committing to two years of work.  However, no one advised her of the excessive liquidated damages provision of the contract.

82.     In July 2009, Ms. Brockington submitted her NHSC application to Defendant Health Resources & Services Administration (HRSA), which approved it on or about September 8, 2009.

83.     When Ms. Brockington signed the contract in July 2009, she had already paid over $10,000 of her $34,650 student loan debt.

84.     In January 2010, Defendant HRSA paid the balance of Ms. Brockington's student loans ($24,321), which was less than half the $50,000 maximum she could have received had her debt been higher.

### The Involuntary Work Interruption and resulting Breach
### of Ms. Brockington's NHSC Contract

85.     On November 10, 2010, Ms. Brockington was summoned by the Naval Reserves from her NHSC job to active military duty.

86.     At the time she was summoned to military service, Ms. Brockington had completed 13 out of the 24 months of her NHSC contract.

87.     From November 10, 2010, to November 30. 2011, Ms. Brockington (who by then had been promoted to Lieutenant Commander) worked as a nurse practitioner, providing medical care to wounded soldiers in Afghanistan and Iraq.

88.     During her service in the Navel Reserves providing care to wounded soldiers in Afghanistan and Iraq, Ms. Brockington had tremendous responsibilities in hazardous environs. Three times a week, she led a team of healthcare professionals who transferred wounded soldiers from Iraq and Afghanistan to Germany and safer military hospitals elsewhere in the Middle East and Europe. This often involved flying into and out of hostile territory.  During medical evacuation flights, Ms. Brockington and her team cared for the wounded soldiers, many of whom had undergone surgery in operating rooms that included limb amputations.  As the most senior medical provider on each flight, Ms. Brockington was responsible for making medical decisions and executing them. On occasion, soldiers died in flight, which caused anguish among the medical and flight crew, including Ms. Brockington.

89.     In addition to transporting wounded soldiers, Ms. Brockington assisted doctors in the operating rooms of army field hospitals in Iraq and Afghanistan.  Many of the patients had shattered limbs that had to be amputated, and many died despite efforts to save them.  Because

these hospitals were in war zones, they were subject to attack and Ms. Brockington therefore had to carry an M-16 rifle while on and off the army base.

90.    Ms. Brockington sometimes helicoptered or drove in armored vehicles from military bases to mountains, deserts, and towns in Iraq and Afghanistan, where she treated wounded soldiers and retrieved the remains of the dead.

91.    Ms. Brockington recounted details of her 2010-2011 deployment to a psychiatrist. She was exposed to "massive amounts of bodies and death" which included "blood, mangled organs and remains." She reported having to "collect remains." On some deployments, she saw explosions and "roll-overs" after which she had to "work on" the wounded soldiers and "collect bodies." She went on "recon" missions where she experienced constant fear for her safety. The most difficult part of her work was caring for dead or wounded "battle buddies" or people she knew.

92.    On December 1, 2011, Ms. Brockington's mandatory military deployment ended, and she returned to civilian life in New York City, although she remained in the Navy Reserves.

93.    Ms. Brockington did not return to work at her NHSC position immediately. Rather, as is allowed when returning from mandatory deployment, she took a leave of absence for 90 days.

94.    Thereafter, Ms. Brockington requested personal leave from her employers at the clinic. She was approved for personal leave through June 25, 2012.

95.    In late May 2012, while on personal leave, Ms. Brockington suffered a late-term miscarriage during the 24th week of gestation.

96.     On June 6, 2012, Ms. Brockington started mental health treatment for "extreme signs of bereavement/grief" including "feelings of sadness, sense of isolation, difficulty sleeping, preoccupation, difficulty concentrating, and tearfulness."

97.     Her treating psychologist prescribed therapy sessions twice a week and recommended that her employer excuse her from work for three to six months.

98.     In June 2012, Ms. Brockington applied for disability benefits with the Veterans Administration (VA). In conjunction with that claim, she was evaluated in person by a non-treating VA psychiatrist.  He found she suffered from anxiety but not Post Traumatic Stress Disorder and the claim was denied.

99.     In the summer of 2012, shortly after her miscarriage and while on unpaid disability leave, Ms. Brockington learned that her NHSC position at the Bronx clinic was going to be eliminated.

100.     At the time, Ms. Brockington was running out of money.  She had been relying mostly on savings to pay her bills during 2012 when she was not working.

101.     Ms. Brockington also remained emotionally at sea – recovering from the devastating grief of a miscarriage while also trying to reconcile the trauma she experienced overseas while deployed.

102.     The military, with its structure, camaraderie, and understanding of the experiences of its war veterans, answered many of Ms. Brockington's needs, including financial ones.

103.      Out of money and in need of work, Ms. Brockington enlisted in the Army in August 2012 where she was given the rank of Major.

104.    The U.S. Army paid $70,000 annually, 10 percent less than what she had earned caring for homeless families at the NHSC approved position at Montefiore ($77,000).

105.    At the time, the U.S. Military was facing a huge shortage of health care professionals.  See General Accounting Office, *Military Personnel: Status of Accession, Retention, and End Strength for Military Medical Officers, and Preliminary Observations Regarding Accession and Retention Challenges* (GAO-09-469R) (April 16,2009), available at https://www.gao.gov/products/gao-09-469r (last visited Sept. 17, 2025).

106.    Indeed, from 2008 to 2016, the shortage of doctors and nurses in the military was so severe that the Department of Defense recruited foreign nationals (non-green card holders) to fill this gap.  See Congressional Research Service, *Foreign Nationals in the U.S. Armed Forces: Immigration Issues*, R48163 (August 19, 2024) available at https://www.congress.gov/crs-product/R48163?q=%7B%22search%22%3A%22R48163%22%7D&s=1&r=1.

107.    After Montefiore confirmed in writing that her NHSC position would be eliminated on August 17, 2012, Ms. Brockington advised Defendant HRSA of the loss of the position as well as of her medical disability caused by the miscarriage.

108.    She asked Defendant HRSA for help finding a position at an approved NHSC work site.  (The army paid 10 percent less than NHSC position, and her preference was to stay in New York City where she was receiving therapy and had friends and family who supported her.)

109.    Defendant HRSA referred Ms. Brockington to its job finder portal.    Ms. Brockington looked on the portal several times, but there was nothing available near New York City. Rather, the nearest open position for which she qualified was in Watertown, New York,

some 325 miles north of New York City near the Canadian border.

110.    Ms. Brockington told Defendant HRSA that taking such a job so far from her support network in New York City would be detrimental to her mental health and cause extreme hardship.  This was only a few months after she had returned from the traumatic experience of tending the bodies of dead and wounded soldiers in war zones, as well as her miscarriage. Remaining in a supportive, familiar community was paramount to her mental health.

111.    On September 9, 2012, Ms. Brockington told Defendant HRSA by email, "This has been a very difficult time for me," and asked for more help in finding an appropriate NHSC job that would not require her to relocate to a remote location far from her community.

112.    On September 13, 2012, employees of Defendant HRSA discussed by email that Ms. Brockington needed help finding work at a NHSC-approved site, noting Ms. Brockington was "being proactive" in her search.

113.    Defendant HRSA, by email, referred Ms. Brockington back to the job site portal and provided the name of an NHSC employee with whom she could consult.

114.    Although Ms. Brockington kept trying to find work, no appropriate position was available in the New York City area, and taking a position elsewhere would have been an extreme hardship given her mental health.

115.    Without a job, out of money, and believing the military was the next best thing to her friends and family in supporting her recovery, Ms. Brockington reported for active duty at a U.S. Army base in Texas on or about October 9, 2012.  Thereafter, she informed Defendant HRSA that she had enlisted in the Army.

116.     In an October 23, 2012, conversation, an HRSA employee advised Ms. Brockington, who had the title of Major in the U.S. Army, that her medical service in the Army was unlikely to be accepted as a satisfactory substitute for her remaining 11 months of service under the NHSC contract.

117.     The HRSA employee, however, did not advise Ms. Brockington that a punitive penalty would be imposed for completing her contract should her service in the Army be rejected as a substitute for the remaining 11 months of service under the NHSC contract.

118.     On February 5, 2013, the same HRSA employee emailed Ms. Brockington stating she would recommend a finding that Ms. Brockington defaulted on her HRSA obligation if Ms. Brockington was still under contract to serve in the Army (which she was).

119.     Again, neither the HRSA employee with whom she was communicating nor anyone else at Defendant HRSA warned Major Brockington of the astronomical penalties that would be imposed if HRSA determined Ms. Brockington's Army service failed to satisfy her NHSC obligations.

**Major Brockington Struggles to Pay Her NHSC Debt While Coping with PTSD and Other Stressors in the Army**

120.     On August 13, 2013, Defendant HRSA sent Major Brockington a default notice stating she defaulted as of October 9, 2012, when her disability leave ended, and now owed $101,048.18.

121.     Defendant HRSA arrived at that number by multiplying $7,500 by the almost 11 months remaining ($82,485.78), adding the amount of the loan repayment for the time not served

($10,428), and then adding interest of over 10 percent retroactively to October 19, 2012.

($8,134). 42 U.S.C. § 254o(c)(1)(C).

122.    Although Defendant HRSA knew Major Brockington was an active-duty nurse

practitioner in the Army, it applied a higher interest rate than allowed by law. 50 U.S.C.

§ 3937(1) (limiting interest on any obligation to 6 percent during active duty.)

123.    The default notice demanded payment "of the total amount due" within one year.

124.    The notice did not provide a mechanism by which the debtor could appeal the

decision or seek a waiver, even though waiver, including the permanent suspension of the service

obligation, is a statutory and regulatory right.

125.    Nor did the notice even mention Ms. Brockington's right to a waiver.

126.    The only form of relief offered as an alternative to full repayment was a

repayment plan.

127.    The criteria for establishing a repayment plan were set forth on the second page of

the notice.  In addition to requesting that Ms. Brockington disclose information about assets,

income and expenses, the notice demanded that Ms. Brockinton seek a personal loan from two

banks for the full amount of the debt.

128.    To enter a repayment plan, the notice demanded:

Documentation from TWO private lending institutions regarding the debtor[']s eligibility
to borrow the largest possible amount up to and including the full amount owed.
Statements showing ineligibility for a loan of the full amount, without reference to
eligibility for a loan of a partial amount will not be acceptable.

Private financing of the debt is strongly recommended due to possible savings in interest
and other costs, and in addition, the debt will not be subject to possible referral to
collection agencies, administrative offset and referral to the Department of Justice for

litigation.

129.    The notice required that any application for a repayment plan also include "[a] check covering the largest portion of the debt which can be paid immediately. This should be at least equal to the largest amount which can be borrowed."

130.    Unaware that she had any right to contest the payment demand or obtain a waiver, Ms. Brockington did not respond to the unreasonable payment demand, and she subsequently received a notice dated March 27, 2014, that her wages would be garnished.

131.    After receiving this notice, Ms. Brockington called Defendant HRSA and recounted the hardships and events beyond her control that had led to her inability to complete the remaining term of the NHSC contract.

132.    The employee of Defendant HRSA did not inform Ms. Brockington of her right to file an appeal or seek a waiver.

133.    Instead, the employee of Defendant HRSA advised Ms. Brockington that she had to make monthly payment of $1,188.47 to avoid wage garnishment.

134.    Major Brockington made two such payments for $1,189 in May and June 2014.

135.    Continuing to make payments of $1,189 a month was impossible for Ms. Brockington as she was supporting her mother and other family members in New York City. That task had become increasingly difficult because her earnings had decreased with each of the public-service jobs she had taken over the preceding five years.  In 2008, she earned $91,767 when working as a civilian in the sickle cell clinic at Montefiore.  In 2010, she earned $77,567 at the NHSC clinic.   In 2013, her wages fell even further to $70,062 when she enlisted in the Army and cared for soldiers and veterans at the Walter Reed Military Medical Center.

136.    As a result of non-payment, Defendants started wage garnishment of $767.07 a month (15 percent of Major Brockington's gross earnings) on August 13, 2014.  Believing she had no options, Ms. Brockington struggled financially as the wage garnishment continued each month thereafter while she treated veterans with substance abuse problems at an Army base in Virginia.

137.    At some point between August 2014 and September 2015, Ms. Brockington informed HRSA that repayment was causing hardship and requested relief.

138.    For a second time, HRSA did not inform Ms. Brockington of the waiver provision but instead told her to submit financial statements so that it could consider an alternative repayment plan.

139.     Ms. Brockington provided the requested financial statements to HRSA but heard nothing further from HRSA.

140.    On September 18, 2015, U.S. Senator Mark R. Warner of Virginia wrote to Defendant HRSA, informing it that Ms. Brockington was about to deploy to Guantanamo Bay, Cuba, and asking for follow-up regarding the payment plan request because wage garnishment was causing Ms. Brockington significant hardship.

141.    Senator Warner also asked whether HRSA could forbear on collections until Ms. Brockington could complete her service, and whether the interest rate (now 10.35 percent) could be dropped to 6 percent given her status as an active military service member.

142.    On information and belief, HRSA did not respond to Senator Warner's letter other than to retroactively reduce the interest rate to 6 percent.

143.    Thereafter, while stationed overseas in Guantanamo Bay in what Ms. Brockington would later describe to a mental health counselor as "a very difficult deployment," Defendant HRSA intercepted Ms. Brockington's tax refund of $9,365 and applied it to her outstanding debt.

144.    Wanting to protect future tax refunds from offset, Ms. Brockington contacted Defendant HRSA and entered into an agreement on March 9, 2016, to pay $790.29 a month to stop forced collections.

145.    Again, Defendant HRSA did not inform Ms. Brockington of her right to request a waiver.

146.    Thereafter, Ms. Brockington made her monthly payments of $790.29 on a timely basis for over seven years from 2016 to October 2024.

147.    Although Ms. Brockington made those payments, doing so caused her extreme financial hardship.

148.    Ms. Brockington was financially responsible for the needs of many family members. She maintained a residence in the Bronx for her disabled mother who was once homeless and for her mother's extended family of sisters, nieces and nephews, expending thousands of dollars each month to maintain her family's home.

149.    Although she needed more space after her son was born in 2017, Ms. Brockington has continued to live with him in a one-bedroom apartment.

150.    From 2019 onward, Ms. Brockington drove 50 miles each way to and from work at the U.S. Military Academy at West Point in a 2006 subcompact with over 100,000 miles on it.

As a single parent, she worried about driving this old car that lacked contemporary safety features, but she could not afford a newer one.

151.    Ms. Brockington was forced to borrow $50,0000 from a friend to make ends meet while paying the NHSC debt.

152.    In April 2020, Ms. Brockington called Defendant HRSA to ask for a forbearance of her $790.29 monthly payment due to Covid 19, which HRSA granted for three months.

153.    During that same April 2020 call, Defendant HRSA informed Ms.  Brockington for the first time of her right to file a waiver application.   Thereafter, Defendant HRSA also sent Ms. Brockington a two-page document explaining the standards governing waiver applications.

154.    After reviewing the application, Ms. Brockington informed HRSA in April 2020 that she would file the application once she completed her medical exams and obtained various reports.

155.    At the time, Ms. Brockington suffered from pain in her left knee from jumping out of helicopters, as well as pain in her back, shoulders and ankles.

156.    In addition to her physical disorders, Ms. Brockington struggled with depression, anxiety, grief related to her miscarriage, and PTSD symptoms related to her military service.

157.    Ms. Brockington received regular mental health treatment, including anti-depressant medication and medication to help her sleep, between 2012 and 2023.

158.    Ms. Brockington applied for a service-connected disability in December 2020 after having total left knee replacement surgery.

159.    By July 2021, Ms. Brockington was deemed disabled and unable to work by the

Army, although her benefit claim remained pending.

160.    On September 10, 2021, Ms. Brockington was discharged from the Army due to her disabilities.

161.    In March 2022, Ms. Brockington began group therapy for women veterans of color with PTSD.

162.    As a retired Major, Ms. Brockington was no longer protected by the Service Members Civil Relief Act that limits interest to 6 percent.  Instead, interest on her debt would be set at the "maximum legal prevailing rate."

163.    On May 2, 2022, Defendant HHS sent a bill showing Ms. Brockington owed $68,198.16 on the debt even though she had paid over $85,000 to HHS while working as a nurse practitioner in various Army posts, including remote ones.

164.    Because this debt was now subject to an adjustable "maximum interest rate" (averaging 11.25 percent from 2022 to 2024), Ms. Brockington's debt would take an additional 14 years to pay-off if she continued payments at $790.29 a month.

165.    Such a payment schedule could mean, depending on interest variations, that Ms. Brockington would have spent an additional $140,000 towards the debt on top of the $85,000 she had already spent.

166.    On September 1, 2022, Ms. Brockington received a 100 percent service-connected disability rating from the VA, effective October 18, 2021, of which 70 percent was due to PTSD and 60 percent related to her knee, 40 percent related to her back, and 60 percent related to another physical injury.

167.    On January 23, 2023, Ms. Brockington contacted Defendant HRSA through counsel, informed it that she wanted to file a waiver because she had a 100 percent service-connected disability, and requested a stay of collection activities because assembling documents regarding her financial obligations was complicated and time-consuming.

168.    On or about January 31, 2023, Defendant HHS stated it lacked authority to stay collections and advised Ms. Brockington to contact Defendant HRSA, who likewise stated it lacked authority to stay collections while the waiver application was assembled.

169.    On September 30, 2023, the Social Security Administration determined Ms. Brockington was disabled within the meaning of the Social Security Act with an onset date of October 17, 2021, which was substantially the same as the VA's finding (onset October 18, 2021.)

170.    On December 15, 2023, Ms. Brockington filed a waiver application with Defendant HRSA seeking a waiver of the remaining debt (about $62,000 at the time) due to impossibility.

171.    The application submitted by Ms. Brockington consisted of hundreds of pages related to her financial obligations, an affidavit, and over 4,000 pages of medical records.

172.    The waiver application also sought the return of all payments made because recovery caused extreme hardship and was against equity and good conscience for a number of reasons, including that the fine was excessive; that Ms. Brockington had constructively completed her service in light of her work in underserved healthcare areas, including war zones and military bases; and because her inability to complete her service was not her fault but rather

the product of mandatory military service, the closing of her NHSC site, the lack of an appropriate alternative NHSC site, disability and trauma.

173.    On October 9, 2024, Defendant HRSA approved the waiver of Ms. Brockington's remaining debt (about $62,000) because completion of her service was rendered "impossible" by her service-connected disability.

174.    Defendant HRSA denied Ms. Brockington's request that it return the collected and taken monies.

175.    In denying Ms. Brockington's request for the return of collected and taken monies, Defendant HRSA stated that the military bases at which she served were not designated as Health Professional Shortage Areas within the meaning of the enacting NHSC statute and hence could not be treated as equivalent service.

176.    HRSA did not address the excessive nature of the fine, or any other aspects of her argument that repayment had caused extreme hardship and repayment was against equity and good conscience, such as the facts that the interruption and non-completion of Ms. Brockington's service were involuntary, that she needed to be able to work in a location where she could continue to receive emotional support following her miscarriage and war experiences, and that she had provided valuable service to the U.S. Government that faced its own shortage of active duty Nurse Practitioners.

177.    Thereafter, Ms. Brockington asked Defendant HRSA if the waiver approval could be applied retroactively to either: a) the effective date of her disability (October 17, 2021); or b) to the date she asked Defendant HRSA to forbear collection on her debt because she had a 100%

27

disability and filing the waiver application would take time, (January 23, 2023); or c) to the date of the filing of her waiver application (December 15, 2023)—all periods during which she was paying $790.29 a month.

178.    Defendant HRSA acknowledged receipt of the request but never provided a substantive response.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### ARBITRARY & CAPRICIOUS DENIAL OF RELIEF UNDER WAIVER PROVISION

179.    Plaintiff reasserts and realleges the above paragraphs as if fully set forth herein.

180.    This claim is brought pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, which authorizes judicial review of final agency action.

181.    Under the Federal Regulations, Defendant HHS, through its subagency Defendant HRSA, may waive or suspend any service or payment obligation incurred by a participant whenever compliance by the participant "(i) is impossible, or (ii)  would involve extreme hardship to the participant and if enforcement of the service or payment obligation would be against equity and good conscience." 42 C.F.R. §§ 62.12(b)(2) and 62.28.

**A. Defendants' decision not to waive Ms.  Brockington's service and payment obligation as of October 9, 2012, was arbitrary and capricious.**

182.    Defendant HRSA's decision not to waive Ms. Brockington's obligation of service retroactively to 2012 was arbitrary and capricious because Ms.  Brockington had amply demonstrated that completion of her service would have caused "extreme hardship", and

enforcement of the obligation was "against equity and good conscience."

183.    Ms. Brockington had just returned from the war theater; was suffering from a late term miscarriage; required community and support to help her recover from the traumas of war; could not return to her previous NHSC worksite because it had closed and no other appropriate NHSC site was available; and was financially destitute and in need of work, which led her eventually to enlist with the U.S. Army where she could get supportive treatment for her PTSD symptoms.

184.    Accepting a NHSC approved position far from New York City would have caused "extreme hardship" given Ms. Brockington's circumstances at the time.

185.    At the same time, the Department of Defense and U.S. Army specifically sought out Ms. Brockington's services due to a nationwide shortage in nurses that resulted in a shortage of nurses within the U.S. Army.  Indeed, the Department of Defense was hiring foreign nationals with no legal ties to the United States, such as a green card, to fill its understaffed hospitals.  The Department of Defense and U.S. Army needed and valued her work, and joining the Army fulfilled her personal commitment to public service.

186.    The federal government paid Ms. Brockington even less in the Army than it had while she worked at the NHSC-approved work site for this public service, and far less than what she had been earning as a civilian in a public hospital.

187.    And Ms. Brockington continued her public service in the military not just for 11 months (the remaining term on her NHSC position) but for almost nine years (October 9, 2012, to September 10, 2021) in far more stressful postings than any NHSC posting, including

Guantánamo Bay, Walter Reed Hospital, and a remote army base in Missouri.

188.    Further, repayment caused Ms. Brockington extreme financial hardship as evidenced by her low pay, need to borrow extensively, cramped living arrangements and reliance on a small, 13-year-old subcompact car with high mileage for a 100-mile commute each day to her position at the U.S. Military Academy at West Point.

189.    Further, Ms. Brockington's war service that interrupted her completion of the NHSC project, and nine years of public service at understaffed military bases that paid poorly eventually disabled her.

190.    Defendants' decision denying a waiver of her obligation therefore should be "h[e]ld unlawful and set aside" as "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

191.    Ms. Brockington is therefore entitled to disgorgement of wrongfully collected and taken monies for this APA violation but not damages.

**B. Defendants' decision not to refund Ms. Brockington's payments made after October 17, 2021, the effective date of Ms. Brockington's 100 percent disability, was arbitrary and capricious.**

192.    Plaintiff was found disabled by the Veterans Administration and the Social Security Administration, with an effective date of October 18, 2021, and October 17, 2021, respectively.

193.    On January 23, 2023, Plaintiff advised Defendant HRSA that she intended to file a waiver application and asked that Defendants forbear on their requirement that she send $790.29 a month because doing so caused hardship due to her 100 percent service-connected disability and the complexity of the waiver application.

194.     Defendants denied Ms. Brockington's forbearance request.

195.     Thereafter, Ms. Brockington continued to make $790.29 payments even though doing so caused her extreme hardship.

196.     After determining that it was impossible for Ms. Brockington to either complete her service obligation or repay her debt due to her 100% disability effective October 17, 2021 and October 18, 2021 by the Social Security and Veterans administrations, respectively, Defendants did not return any of the money Major Brockington paid after that date, including the money paid after she filed the waiver application on December 15, 2023.

197.     Self-servingly choosing the October 2024 as the date that completion of Major Brockington's work obligation was impossible, and not the date when she became 100 percent disabled, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

198.     Ms. Brockington is therefore entitled to disgorgement of monies paid to and collected by Defendants for this APA violation, but not damages.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE EXCESSIVE FINES CLAUSE**

199.     Plaintiff reasserts and realleges the above paragraphs as if fully set forth herein.

200.     Section 706(2)(B) of the Administrative Procedure Act authorizes a federal court to set aside a federal agency's action that is "contrary to [a] constitutional right."

201.     The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

31

202.    "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'" *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)).

203.    The Excessive Fines Clause applies to punitive civil penalties imposed by federal law. See *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021).

204.    The touchstone of the Excessive Fines Clause is the imposition of monetary penalties as "punishment for some offense." *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (quoting *Bajakajian*, 524 U.S. at 327–28).

205.    The penalties imposed against Ms. Brockington are, by their nature, punitive.

206.    Under Defendant HRSA's punitive scheme, Ms. Brockington was assessed a $82,485.78 penalty that was almost eight times greater than the $10,428 of loan repayment attributed to her period of non-service and was therefore inherently punitive.

207.    The former, less-excessive penalty of $1,000 for each-month-not-served adequately redressed the government's actual damages and resulted in default rates at 2 percent.

208.    Because the fine imposed by Defendants are excessive and grossly disproportional to the gravity of the Ms. Brockington's offense, the Defendants' actions should be "h[e]ld unlawful and set aside" as "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

209.    Ms. Brockington is therefore entitled to the return of monies paid to and collected by Defendants, but not damages, for the Eighth Amendment violation.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE SEVENTH AMENDMENT

210.    Plaintiff reasserts and realleges the above paragraphs as if fully set forth herein.

211.    Section 706(2)(B) of the Administrative Procedure Act authorizes a federal court to set aside a federal agency's action that is "contrary to [a] constitutional right."

212.    The Seventh Amendment guarantees the right to trial by jury in all suits which are not of equity or admiralty jurisdiction.

213.    The assessment of a large debt designed to punish and or deter Ms. Brockington's conduct is neither an action in equity nor admiralty.

214.    By imposing punitive damages against Ms. Brockington without a jury trial—and, indeed, without the opportunity to appear before any tribunal at all, Defendants violated the Seventh Amendment, and their actions should be "h[e]ld unlawful and set aside" as "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B).

215.    Ms. Brockington is therefore entitled to the return of monies paid to and collected by Defendants, but not damages, for the Seventh Amendment violation.

## FOURTH CAUSE OF ACTION
## FAILURE TO PROVIDE RIGHTS AND REMEDIES
## BEFORE TAKING PROPERTY IN VIOLATION OF FIFTH AMENDMENT'S
## GUARANTEE OF DUE PROCESS

216.    Plaintiff reasserts and realleges the above paragraphs as if fully set forth herein.

217.    Section 706(2)(B) of the Administrative Procedure Act authorizes a federal court to set aside a federal agency's action that is "contrary to [a] constitutional right."

218.    Under 42 U.S.C.A. § 254o(d)(2) an NHSC debt or service obligation may be

waived "whenever compliance by the individual is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable."

219.    Defendant HRSA's default notice failed to provide Ms. Brockington with notice of her statutory right to a waiver, and she did not learn of these rights until she spoke with an employee of Defendant HRSA in April 2020 when seeking forbearance due to the Covid 19 epidemic.

220.    Had she known of these rights at the time she received the default notice in 2013, Ms. Brockington would have exercised those rights earlier and avoided the financial distress and extreme hardship associated with years of extracted payments.

221.    Because Defendants took her property without due process, the Defendants' actions should be "h[e]ld unlawful and set aside" as "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B) and the Court should order Defendants to disgorge the collected and taken monies it collected.

222.    Ms. Brockington is therefore entitled to the return of monies paid to and collected by Defendants, but not damages, for the Fifth Amendment violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a) Enter a declaratory judgment:

    a.    That Defendants' decision not to retroactively waive Ms. Brockington's service and payment obligation was arbitrary and capricious and unlawful.

34

b.  That Defendants' imposition of excessive punitive damages calculated at $7,500 per month facially violated the Eighth Amendment and was unlawful;

c.  That Defendants' imposition of fine to punish or deter conduct without a jury trial facially violated the Seventh Amendment and was unlawful;

d.  That Defendants' failure to advise Ms. Brockington of her statutory waiver rights in its default notice and collection notices facially violated the due process clause of the Fifth Amendment and was unlawful;

b)  Order that Defendants disgorge and return to Plaintiff all collected and taken monies, which, on information and belief, amount to $109,410.70, for any and all of Defendants' unlawful acts;

c)  Award Plaintiff costs, disbursements, and reasonable attorney's fees incurred in bringing this action, pursuant to 28 U.S.C. § 2412; and,

d)  Award such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
September 19, 2025

By:    *JOHNSON M. TYLER*

JOHNSON M. TYLER
AISHA BARUNI
RACHEL GEBALLE
SHABNAM FARUKI
SARA MANAUGH
Brooklyn Legal Services
105 Court Street, 4th Floor
Brooklyn, NY 11201
(718) 237-5500

*Attorneys for Plaintiff*

35